UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY CARDENAS, ) | |
| ) | Case No. 08 C 2452 |
| Plaintiff, ) | |
| ) | Hon. Marvin E. Aspen |
| v. ) | |
| ) | |
| CITY OF CHICAGO and DAVID TENCZA, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Henry Cardenas filed a three-count First Amended Complaint against Defendants the City of Chicago, David Tencza, and other police officers. Cardenas voluntarily dismissed several claims, leaving only Counts II and III against the City of Chicago and Tencza. Count II alleges illegal search and seizure in violation of the Fourth Amendment, and Count III alleges violation of Cardenas's Second Amendment right to bear arms. Presently before us is Defendants' motion for summary judgment. For the reasons stated below, we grant the motion.

I.  STATEMENT OF FACTS[1]

In the early morning hours of June 17, 2007, Defendant David Tencza, a Chicago police officer, knocked on the front door of Plaintiff Henry Cardenas's second-floor apartment. (Def.

---

[1] The facts described are undisputed. We primarily rely on Defendants' Local Rule 56.1 statement of facts. Cardenas did not respond to Defendants' statement of facts, and therefore, with the exception of one paragraph, we deem those facts admitted. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). In his Response brief, Cardenas does respond with supporting evidence to the factual content of paragraph 31 of Defendants' statement of facts. (Resp. at ¶ 10.) We incorporate his response to paragraph 31 into our assessment of the facts.

Facts ¶¶ 30–31.) About an hour earlier, (*see* Def. Ex. G, Tencza Dep. at 15; Def. Ex. E, Tinoco Dep. at 49), while on patrol, Tencza had observed a young male he believed to be in violation of curfew walk through the exterior gate leading to the two-story residence containing Cardenas's apartment. (Def. Facts ¶ 6.) When Tencza and his partner attempted to stop the young male in order to conduct a field interview, the young male fled on foot. (*Id.* ¶ 7.) Tencza and his partner chased after the young male but lost him in an alley about a block from Cardenas's apartment. (*Id.* ¶¶ 8–9.) During the pursuit, Tencza observed a gun in the young male's hand. (*Id.* ¶ 9.) After an unsuccessful search of the alley, Tencza returned to the two-story residence the young male had been approaching when Tencza originally observed him. (*Id.* ¶10; Def. Ex. G, Tencza Dep. at 14–15.)

Upon Tencza's return, the first-floor resident, Jose Tinoco, noticed Tencza and another officer outside and motioned for them to come to the front door. (Def. Facts ¶¶ 11–12.) Tinoco opened the front door. (*Id.* ¶ 13.) Without entering the first-floor apartment, Tencza asked Tinoco if he had a son. (*Id.* ¶ 14.) Tinoco then motioned his arm toward the inside of the apartment to point at a photograph on the wall about six feet from the door. (*Id.*) In response, Tencza stepped into the apartment toward the photograph and then briefly searched the first-floor apartment for the young male to no avail. (*Id.* at 14, 16.) Tinoco neither protested Tencza's entry into his apartment, nor asked him to leave at any point. (*Id.* ¶ 24; Def. Ex. E, Tinoco Dep. at 47–49.) Tinoco indicated to Tencza that there was another apartment upstairs and showed Tencza the staircase leading from the living room of his first-floor apartment to the front door of Cardenas's second-floor apartment. (Def. Facts ¶¶ 14, 25, 27.) Tencza ascended the staircase and knocked on Cardenas's door. (*Id.* ¶¶ 30–31; Def. Ex. G, Tencza Dep. at 25.)

2

Loretta Cardenas, Henry Cardenas's wife, opened the door to the second-floor apartment and recognized Tencza as a police officer. (Def. Facts ¶ 31.) The precise details of the next few moments are somewhat disputed, however, the following sequence of events is not. Tencza asked whether any teenagers lived in the second-floor apartment, and Mrs. Cardenas said no. (*Id.* ¶ 32.) Tencza, still standing outside the door of the second-floor apartment, noticed what he believed to be a shotgun a few feet behind Mrs. Cardenas leaning upright against an interior doorframe. (Def. Ex. G, Tencza Dep. at 26.) The gun, which was in fact not a shotgun but an air rifle, was not in a case. (Def. Facts ¶ 41, 45.) Mrs. Cardenas stepped back from the front door,[2] at which point Tencza entered the threshold of the apartment. (*Id.* ¶ 35.) At about the same time, Mr. Cardenas appeared from the doorway against which was leaning the air rifle Tencza believed to be a shotgun. (*Id.* ¶ 37.) Tencza stated he was nervous, called for backup, (Def. Ex. A, Cardenas Dep. at 65; Def. Ex. D, Loretta Cardenas Dep. at 54), and secured the air rifle.[3] According to Cardenas, Tencza briefly questioned Cardenas about the gun and about whether any teenagers lived in the second-floor apartment; Cardenas replied that no teenagers lived there and that the gun was merely an air rifle. (Def. Ex. A, Cardenas Dep. at 58–63.)

Tencza asked Cardenas whether he had other guns in the apartment, and Cardenas indicated that he did have other guns. (Def. Facts ¶ 46.) Cardenas kept his guns locked in two

---

[2] The parties dispute why she stepped back. Mrs. Cardenas testified that she stepped back to allow her husband to step forward to speak with Tencza. (Def. Ex. D, Loretta Cardenas Dep. at 22.) Tencza testified that he ordered Mrs. Cardenas to step back when he noticed what he believed to be a shotgun. (Def. Ex. G, Tencza Dep. at 26.) This dispute, however, is not material.

[3] Cardenas testified that after Tencza asked about the gun, Cardenas picked it up and then was ordered to put it back down. (Def. Ex. A, Cardenas Dep. at 63, 66.) Tencza testified that he immediately seized the gun upon entering the apartment. (Def. Ex. G, Tencza Dep. at 28.) In either case, shortly after entering the apartment, Tencza secured the weapon.

3

safes: one in a closet near the kitchen and one in his bedroom. (*Id.* ¶ 51.) Cardenas retrieved the registration records for five rifles and showed them to Tencza. (*Id.* ¶ 47.) Tencza asked to see those guns, and in response Cardenas stated that he believed Tencza's request violated his Second Amendment rights. (*Id.* ¶ 48.) Tencza again asked to see the guns, and Cardenas said, "Okay, fine," and led Tencza to the gun safe located in a closet near the kitchen. (*Id.* ¶ 49–50; Def. Ex. A, Cardenas Dep. at 88.)

Cardenas opened the closet door and told Tencza that the safe inside contained several unregistered guns in addition to the five registered rifles. (Def. Facts ¶¶ 52–52.) Tencza asked Cardenas to open the safe and step away, and Cardenas complied, opening the safe and stepping back into the kitchen. (*Id.* ¶ 54.) Tencza checked the registration of all guns in the safe, six hand guns and six rifles in total. (*Id.* ¶¶ 55–56.) Cardenas assisted Tencza by indicating to Tencza where to find the serial numbers on the guns. (*Id.* ¶55.) Tencza returned five registered guns to the safe and placed seven unregistered guns on a table. (*Id.* ¶¶ 57, 60.) Cardenas never asked Tencza to leave his kitchen or get out of his closet and never refused to unlock the safe. (*Id.* ¶¶ 58–59, 71.)

Tencza then asked Cardenas if he could look in the bedroom safe. (*Id.* ¶ 61.) Cardenas again stated that he believed Tencza was violating his Second Amendment rights, but nevertheless led Tencza to the safe, told Tencza the safe contained unregistered firearms, and unlocked the safe. (*Id.* ¶¶ 62–63.) After Cardenas stepped away from the unlocked safe, Tencza removed the firearms inside from it, none of which were registered. (*Id.* ¶¶ 64, 66–67.) Cardenas never asked Tencza to leave his bedroom and never refused to open the safe. (*Id.*

4

¶¶ 65, 71.) Cardenas testified that he never told Tencza to leave his apartment at any point on June 17, 2007. (*Id.* ¶ 72.)

The Chicago police seized from Cardenas and inventoried a total of thirteen firearms, all of which were unregistered and unregisterable. (*Id.* ¶ 68.) Cardenas was arrested for possessing unregistered firearms. (*Id.* ¶ 69.)

II. STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c)(2). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rely merely on allegations or denials in its own pleading" but rather must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

III.	ANALYSIS

Cardenas claims that on June 17, 2007, Tencza and the City of Chicago violated his Second Amendment rights (Count III) and Fourth Amendment rights (Count II). We address each claim below.

A. Fourth Amendment Search and Seizure

"The Fourth Amendment protects the 'right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures.'" *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010) (quoting U.S. Const. amend. IV). It is undisputed that Tencza searched Cardenas's apartment and seized his person and property within the meaning of the Fourth Amendment. The central question is whether these actions were reasonable.

"Warrantless searches and seizures within a home are considered presumptively unreasonable and a violation of the Fourth Amendment." *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010) (citing *United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007)). Courts have accepted a few specific exceptions to the warrant rule, including when the entry is made with voluntary consent and when exigent circumstances require immediate action. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973) (discussing consent exception); *Payton v. New York*, 445 U.S. 573, 587–88, 100 S. Ct. 1371, 1381 (1980) (discussing exigent circumstances exception). When an appropriate exception applies, a warrantless entry is reasonable under the Fourth Amendment.

Cardenas's Fourth Amendment claim can be broken down into three distinct alleged violations: searching the residence, seizing the guns, and arresting Cardenas. The residence search can be further divided into various moments: entering the first-floor apartment, entering

7

the second-floor apartment, and searching the second-floor apartment. We keep these various moments and alleged violations in mind as we analyze Count II.

        1.        Search of the Residence

                a.        Entry into First-Floor Apartment

Defendants claim that Tencza's initial warrantless entry into the first-floor apartment was justified by exigent circumstances, namely that he was in hot pursuit of a fleeing suspect. The primary question for determining whether exigent circumstances exist is "'whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape.'" *Llaguno v. Mingey*, 763 F.2d 1560, 1564 (7th Cir. 1985) (quoting *United States v. Acevedo*, 627 F.2d 68, 70 (7th Cir. 1980)). One form of exigent circumstances is when the police are pursuing a fleeing suspect. Although the parties argue whether such circumstances permitted Tencza's entry into the building, the hot pursuit analysis is inapplicable to this case.[4]

---

[4] Indeed, the facts of this case give rise to several questions, which undermine reliance on the hot pursuit theory. For example, it is unclear whether Tencza truly "chased" the young male, whether the underlying offenses that the suspect might have been committing were serious enough to justify a warrantless entry, and whether Tencza had a strong reason to believe that the suspect had returned to the home at issue. *See, e.g.*, *Welsh v. Wisconsin*, 466 U.S. 740, 753–54, 104 S. Ct. 2091, 2099–100 (1984) ("We . . . hold that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made."); *United States v. Santana*, 427 U.S. 38, 42–43, 96 S. Ct. 2406, 2409–10 (1976) (explaining that "some sort of chase" is required, although it need not be a long, drawn out chase through public streets); *Dorman v. United States*, 435 F.2d 385, 393 (D.C. Cir. 1970) (noting that one relevant factor in determining whether exigent circumstances permit a warrantless entry for arrest is whether the police have a "strong reason to believe that the suspect is in the premises being entered"). The hot pursuit doctrine has no bearing on our decision.

Nevertheless, the entry was reasonable. The undisputed facts show that Jose Tinoco, the first-floor resident, consented to Tencza's entry. As mentioned earlier, a warrantless entry into a residence is reasonable if consent is given. *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043–44. Consent can be "manifested in a non-verbal as well as a verbal manner." *United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000) (citing *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996)). Non-verbal actions sufficient to convey consent include stepping back from a doorway to permit officers to enter, *Walls*, 225 F.3d at 863, and gesturing for officers to enter, *United States v. Rosario*, 962 F.2d 733, 736–39 (7th Cir. 1992). The behavior of the consenting person after the police have entered is also relevant in determining whether consent was given. *See Walls*, 224 F.3d at 863; *see also Gerald M. v. Conneely*, 858 F.2d 378, 384–85 (7th Cir. 1988).

In our case, Tinoco noticed Tencza outside, signaled for him to come to the front door, and opened the door to speak with him. Tencza stood outside the open door and did not demand entry. Tinoco recognized Tencza as a police officer and spoke with him as Tencza stood outside the residence. Tencza asked whether Tinoco had a son. In response, Tinoco motioned his arm toward the inside of the apartment, pointing to a photograph six feet inside the door. Tencza followed Tinoco's gesture, stepping inside the apartment toward the photograph. Tinoco did not stop Tencza from entering, protest his entry in any way, or ask him to leave once he had entered. Tinoco continued speaking with Tencza once he entered and showed him to the staircase leading to Cardenas's second-floor apartment. Tinoco's behavior before and after Tencza entered his apartment can only be interpreted as voluntary consent. Accordingly, Tencza's entry into the first-floor was reasonable.

b.     Entry into Second-Floor Apartment

We next address Tencza's warrantless entry into the second-floor apartment. Defendants argue the entry was lawful because after Tencza observed the air rifle, which he believed to be a shotgun, sitting inside the apartment within a few feet of Mrs. Cardenas, he had a duty to enter the apartment and seize the weapon for his own safety or to prevent it from being destroyed or hidden. (Mem. at 11; Reply at 7.)[5] An officer may make a warrantless entry to seize a dangerous weapon in order to protect his safety or the safety of others. *See Huddleston*, 593 F.3d at 600 (citing *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996)); *see also Huddleston*, 593 F.3d at 600 (noting that "[a] number of circuits have found the presence of guns to justify searches and seizures on the basis of exigent circumstances" and collecting cases from other circuits). "In determining whether exigent circumstances existed, [we] 'analyze the situation from the perspective of the officers at the scene,'" and "'[e]xigent circumstances exist if an officer had an objectively reasonable belief that there was a compelling need to act and no time to obtain a warrant.'" *Huddleston*, 593 F.3d at 600 (quoting *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005) and *Bell*, 500 F.3d at 613) (internal quotation omitted).

---

[5] Defendants improperly refer to this theory as the "plain view" doctrine. (*See* Mem. at 8–11; Reply at 7–8.) The plain view doctrine permits an officer, after lawfully entering a residence, to seize unanticipated contraband that is in plain view. *See Horton v. California*, 496 U.S. 128, 136–37, 110 S. Ct. 2301, 2307–08 (1990). The plain view doctrine does not, by itself, permit an officer to make a warrantless entry into a residence to seize contraband viewed from outside the residence. *Horton*, 496 U.S. at 137, 110 S. Ct. at 2308, n.7 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 468, 91 S. Ct. 2022, 2039 (1971)). Thus, the plain view doctrine cannot apply here to permit Tencza's entry into the second-floor apartment. But in making their "plain view" argument, Defendants are actually arguing a different theory: "Once Officer Tencza observed the air rifle, he had a duty to seize the incriminating object *for officer safety and to prevent the rifle from being hidden or destroyed*." (Mem. at 11; Reply at 7) (emphasis added). This is clearly an exigent circumstances argument and we will treat it as such.

Our case is nearly identical to *United States v. Reed*, a decision from the Fourth Circuit recently cited with approval by the Seventh Circuit. 935 F.2d 641 (4th Cir. 1991) (cited in *Huddleston*, 593 F.3d at 600). In *Reed*, two state troopers approached a trailer home without a warrant. 935 F.2d at 642. The troopers were aware that the owner had a prior arrest for a weapons-related offense. *Id*. Standing outside the open front door of the trailer, the troopers observed a shotgun laying on the floor within arms-reach of a man inside. *Id*. The troopers did not know how many persons were inside the trailer. *Id*. The troopers entered the trailer and seized the weapon. *Id*. The Fourth Circuit held that the troopers' actions were justified because they "could have reasonably found exigent circumstances justifying [the] seizure." *Id*. at 643.

In our case, Tencza approached the front door of the second-floor apartment without a warrant. He was aware that earlier that morning an unidentified, armed suspect attempted to enter the residence but fled when Tencza approached him. Standing outside the open door of the second-floor apartment, Tencza observed what he believed to be a shotgun leaning against a wall within arms-reach of Mrs. Cardenas. Tencza did not know how many persons were inside the apartment. Tencza entered the apartment and secured the gun. Under these circumstances, Tencza could have reasonably feared for his safety, and indeed the evidence suggests that he did: Cardenas testified that Tencza told him to step back because he was nervous about the gun. The undisputed facts show that exigent circumstances existed to permit Tencza's entry into the second-floor apartment, and accordingly, the entry was reasonable.[6]

---

[6] In addition, Cardenas fails to respond to this argument at all. Defendants raised the argument in their opening brief and supported it with factual evidence. Cardenas's failure to respond to a well-supported summary judgment argument further supports our conclusion that the entry into the second-floor apartment was reasonable.

c.       Search of Second-Floor Apartment

Next, we must address whether Tencza's search of the second-floor apartment violated the Fourth Amendment. A warrantless residence search is presumptively unreasonable under the Fourth Amendment, but a search made with voluntary consent is reasonable. *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043–44. Consent may be given verbally or non-verbally but in either case must be voluntary. *See Walls*, 225 F.3d at 863 (citing *Cotnam*, 88 F.3d at 495).

"[T]he question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S. Ct. at 2047–48. In civil actions under Section 1983, the Seventh Circuit has adopted a burden-shifting approach to analyze voluntary consent to warrantless searches. Because warrantless searches are presumptively unreasonable, the defendant must initially produce evidence of consent to show that the search was reasonable. *Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997). Once consent is shown, the burden shifts to the plaintiff to prove its consent was the product of duress or coercion, and thus that the search was unreasonable. *Id.*; see *also McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009) (citing *Valance* with approval); *Antonelli v. Sherrow*, 246 Fed. App'x 381, 384 (7th Cir. 2007).

Defendants argue Cardenas consented to Tencza's search of the second-floor apartment, and we agree. They have shown the following facts to support consent. After securing the air rifle, Tencza asked if Cardenas had any other guns, and Cardenas said yes. Cardenas then retrieved the registration records for five of his guns and brought them to Tencza. When Tencza asked to see the guns, Cardenas eventually said, "Okay, fine," and walked Tencza to the kitchen

12

safe, unlocked and opened the safe, and backed away to allow Tencza to access the safe. When Tencza asked to access the bedroom safe, Cardenas walked Tencza to the safe, opened the safe, and backed away to allow Tencza access. Cardenas did not ask Tencza to leave the kitchen or bedroom or stop examining the safes. In fact, Cardenas assisted Tencza by indicating where to find the serial numbers on the guns. Cardenas's statement that he was "Okay" with the search combined with his actions during the search clearly indicate consent.

Whether Cardenas's consent was voluntary and free from duress or coercion is another question—one that Cardenas bears the burden of proving. Although there are facts in the record from which Cardenas might make a colorable argument for duress or coercion—for example, that he twice protested about his Second Amendment rights—he makes no such argument.[7] Cardenas cites appropriate case law to support the standard that consent must be voluntary and free from duress or coercion. (*See* Resp. ¶ 9.) But he points to not a single fact to support duress or coercion nor a single case in which the court held that a party's consent was involuntary on analogous facts. (*See id.*) As the Seventh Circuit has often repeated, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wisc. Dept. of Corr.*, 175 F.3d

---

[7] In response to Defendants' consent argument, Cardenas makes a single argument that is not relevant to whether his consent to search was voluntary. Cardenas argues that, based on Mrs. Cardenas's deposition testimony, a question of fact exists whether Tencza's entry into the second-floor apartment was made with consent. (*See* Resp. at ¶ 10.) Mrs. Cardenas testified that Cardenas told Tencza several times that he was not invited into the apartment. (Def. Ex. D, Loretta Cardenas Dep. at 22.) As stated above, Tencza's entry into the apartment was not made with consent, but rather he entered in response to exigent circumstances, ensuring his own safety by securing the weapon immediately inside the door. Furthermore, the fact that Tencza was not invited in does not show that Cardenas's consent to search the gun safes was the product of duress or coercion, nor does Cardenas make this argument.

497, 504 (7th Cir. 1999), *rev'd on other grounds*, *Higgins v. Mississippi*, 217 F.3d 951 (7th Cir. 2000). Cardenas has failed to put up any facts or argument to support a finding that his consent was involuntary, and therefore, based on the evidence he has presented, no reasonable jury could find in Cardenas's favor. Accordingly, because the search of the second-floor apartment was made with Cardenas's consent, it was reasonable under the Fourth Amendment.

2. Seizure of Firearms and Arrest of Cardenas

Having established that Tencza's entry and search of Cardenas's residence did not violate the Fourth Amendment, all that remains of Count II is Cardenas's claim that his rights were violated when Tencza seized Cardenas's weapons and person. As stated above, it is undisputed that the seizures occurred; the only dispute is whether they were reasonable.

For a seizure of property during a valid warrantless search to be reasonable, the seizing officer must "have a lawful right of access to the [seized] object," and the object must have an incriminating character that is immediately apparent. *Horton v. California*, 496 U.S. 128, 136–37, 110 S. Ct. 2301, 2308 (1990). Restated, the second element requires "a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294, 307, 87 S. Ct. 1642, 1650 (1967). Tencza had lawful access to Cardenas's guns because Cardenas gave Tencza his consent to examine them. The seized guns were themselves contraband, the possession of which is prohibited by Chicago's municipal code, and thus the nexus between them and criminal behavior is self-evident: simply possessing the guns is illegal. Accordingly, Tencza's warrantless seizure of Cardenas's unregistered guns was reasonable.

Moving to Cardenas's arrest, the existence of probable cause is an absolute bar to a Section 1983 claim of false arrest. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010) (citing *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009)). "A police officer has probable cause to arrest an individual when the facts and circumstances that are known to him reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Prior to arresting Cardenas, Tencza verified that the seized firearms were unregistered and therefore illegal to possess. Cardenas challenges neither that these guns were illegal, nor that Tencza verified their status prior to arresting Cardenas. These facts known to Tencza at the time of the arrest provided probable cause to arrest Cardenas, negating his false arrest claim. Accordingly, Count II fails as a matter of law.

      B.      Second Amendment Right to Bear Arms

Finally, in Count III, Cardenas alleges that Tencza and the City of Chicago violated his Second Amendment right to bear arms by seizing his unregistered firearms and refusing to return them. The law of the Seventh Circuit is clear: the Second Amendment has not been incorporated to apply to the States. *NRA v. City of Chi.*, 567 F.3d 856 (7th Cir. 2009); *see also Justice v. Town of Cicero*, 577 F.3d 768, 774 (7th Cir. 2009). In other words, Cardenas has no individual right to bear arms enforceable against the State of Illinois, any of its subdivisions, or associated actors, including the City of Chicago and Tencza. Although Plaintiff is correct that the Supreme

Court could soon change this settled law, (*see* Resp. ¶ 14), as of today it remains settled. Accordingly, Count III fails as a matter of law.[8]

IV. CONCLUSION

For the reasons stated above, we grant Defendants' motion for summary judgment. This case is dismissed. It is so ordered.

_____
MARVIN E. ASPEN
United States District Judge

Dated: June 25, 2010

---

[8] Assuming *arguendo* that the Second Amendment applies to the States and that Tencza's actions violated it, he would nevertheless be entitled to qualified immunity. To overcome qualified immunity, Cardenas would need to show that his individual right to bear arms enforceable against Tencza was clearly established at the time of the violation. *See Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 815–16 (2009); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). Whatever the Supreme Court decides in its pending cases, on June 17, 2007, before even the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. —, 128 S. Ct. 2783 (2008), it was not clearly established that the Second Amendment prohibited States or State subdivisions from banning possession of certain firearms and permitting police to seize them. To the contrary, prior to *Heller*, no individual right to bear arms was clearly established, whether as against the federal government or the States. Thus Tencza would be entitled to qualified immunity. *See, e.g.*, *Dorr v. Weber*, No. 08-4093, 2010 WL 1976743, at *7–9 (N.D. Iowa May 18, 2010); *Warden v. Nickels*, No. 09-1686, 2010 WL 933875, at *4–5 (W.D. Wash. Mar. 11, 2010); *Slough v. Telb*, 644 F. Supp. 2d 978, 998 (N.D. Ohio 2009); *Bletz ex rel. Estate of Bletz v. Gribble*, 640 F. Supp. 2d 907, 923 (W.D. Mich. 2009).